UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: Lin R. Schryer, | ) | Bankruptcy No.  12-84683 |
| and | ) | |
| Annette K. Schryver, | ) | Adversary No.  14-96009 |
| Debtors. | ) | |
| Keith Ruter, | ) | Chapter 7 |
| Plaintiff, | ) | |
| v. | ) | Judge Lynch |
| Lin R. Schryver, | ) | |
| and | ) | |
| Annette K. Schryver, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on creditor Keith Ruter's objection to discharge and complaint to find a debt excepted from discharge.  For the reasons set forth herein, the objection to discharge will be sustained and both Debtors will be denied a Chapter 7 discharge.  Because they will be a denied a discharge, the Plaintiff's request to find a specific debt excepted from discharge under 11 U.S.C. § 523(a)(6) will be dismissed without prejudice as moot.

## JURISDICTION

The court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).  The Chapter 7 bankruptcy discharge is a statutory injunction created by Sections 524 and 727 of the Bankruptcy Code and therefore the determination to deny a discharge is a matter that arises under Title 11 and is within this court's

constitutional authority to enter final judgment. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011) (bankruptcy courts have authority to issue final judgment on an issue that "stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."). *See also Deitz v. Ford (In re Deitz)*, 760 F.3d 1038, 1049-50 (9th Cir. 2014) ("Exception to discharge claims arise solely under title 11 and ... are examples of the bankruptcy courts doing what they are supposed to do."). Additionally, at the beginning of trial on November 12, 2015, both the Schryvers and the Plaintiff expressly agreed the issues raised in the complaint were core matters and consented to this court entering final judgment.

## PROCEDURAL HISTORY

Plaintiff, Keith Ruter, filed his adversary complaint through counsel on January 22, 2014.[1] The Debtors' counsel in the underlying bankruptcy case filed an appearance on their behalf and subsequently filed the Debtors' answer, which pleading with leave of court was amended on May 7, 2014. The court allowed considerable time for discovery because of, among other things, a contemporaneous investigation by the Bureau of Alcohol, Tobacco, Firearms and Explosives, and delays in obtaining documents from the ATF. Although the parties were able to reach agreement on a discovery dispute that developed, the Debtors' counsel, with the approval of his clients and leave of court withdrew as counsel in both the bankruptcy and the adversary proceeding on April 29, 2015, citing "irreconcilable differences ...

---

[1] Although the Debtors' Section 341 meeting was first set for and held on January 24, 2013, Mr. Ruter had timely requested and was granted extensions to file objections to discharge under Section 727 or an action to object to the dischargeability of a debt under Section 523 through January 22, 2014. (*See* Case No. 12-84683, ECF Nos. 19, 41, 49, 57, 63.)

concerning strategies in the pending cases." (Mot. to Withdraw, ECF No. 29.) The court gave the Debtors the opportunity to find new counsel if they chose, setting a pre-trial conference in late July, but they ultimately chose to proceed to trial *pro se*.

Trial was held over the course of three days, with the Schryvers representing themselves throughout. Witnesses who testified at trial included Lin Schryver, Annette Schrvyer, Keith Ruter, Brian Potempa (a principal of Twin Image, Inc. and Ka-Ching Global Sourcing Inc.), Jeffrey Snyder (president of Forreston State Bank), Jeff Cowman (a computer repair person familiar with the Debtors' computer), and Jeremy Penington (a former part-time worker at the Debtors' store). The Plaintiff and the Debtors also presented a number of exhibits which were received into evidence. Both parties presented closing arguments at the end of trial and were given leave to file post-trial proposed findings of fact and conclusions of law, which the Plaintiff filed on February 26, 2016 and the Debtors filed on March 17, 2016.

The court warned the Debtors of the potential difficulty of proceeding to trial without assistance of counsel, both at the time their counsel was given leave to withdraw and at the pre-trial conference. The court also attempted to give the Debtors every reasonable latitude and accommodation at trial, but they were still bound by the relevant rules and law. *See, e.g., Steege v. Johnsson (In re Johnsson)*, 551 B.R. 384, 391-92 (Bankr. N.D. Ill. June 2, 2016). The findings of fact below are made from the evidence adduced at trial.

## FINDINGS OF FACT[2]

Lin and Annette Schryver, with the assistance of counsel, filed a joint petition for protection under Chapter 7 of the Bankruptcy Code on December 18, 2012. (Case No. 12-B-84683.) The Schryvers together were the sole owners of Schryver Gun Sales, Inc., an Illinois corporation which itself filed a voluntary petition under Chapter 7 on the same date, through the same counsel and signed by Lin Schryver, as president of Schryver Gun Sales, Inc. (Case No. 12-B-84686.)

*Formation of Schryver Gun Sales, Inc. and Loans from Forreston State Bank*

At the time of the petition Schryver Gun Sales, Inc. was owned 50% by Lin and 50% by Annette. Lin was a director, president, vice president and treasurer of Schryver Gun Sales, Inc. and Annette was a director and secretary. The company was formed in January 2011 and operated a retail firearms and firearms accessories store at 304 S. Oak Ave., Forreston, Illinois (the "Oak Ave. Property"), until December 2012. Schryver Gun Sales also provided services for firearms, including ceramic coating, and developed, marketed and sold cheek pads for rifles.

The Plaintiff, Dr. Keith Ruter, is a dentist who later opened a gun shop of his own. He originally owned the Oak Ave. Property, and sold it to the Schryvers on an installment contract for deed that was not fully paid as of the petition date. Dr. Ruter also guaranteed and pledged additional collateral for three loans that the Schryvers and Schryver Gun Sales, Inc. received from Forreston State Bank on or about April

---

[2] The following sets forth this court's findings of fact as required by Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

16, 2012.[3] Each of the Schryvers, Schryver Gun Sales, Inc. and Dr. Ruter were listed as co-borrowers on the three notes. Dr. Ruter testified without contravention that he did not receive any of the loan proceeds. The first loan was a line of credit of up to $95,000, from which $80,502.26 was used to repay two outstanding loans to Forreston State Bank. That loan had a maturity date of April 16, 2013, and was secured by a blanket security interest in essentially all personal property of the Schrvers, Schryver Gun Sales, Inc., and Dr. Ruter. The second loan was in an initial principal amount of $217,440.27, from which $181,440.27 was used to repay two outstanding loans to Forreston State Bank. This loan had a maturity date of April 15, 2015, and was secured by a blanket security interest in the personal property of the Schrvers, Schryver Gun Sales, Inc., and Dr. Ruter. It was also secured by mortgages in the Schryvers' residence in Forreston, Illinois, the Oak Ave. Property, and a storage facility and farm land owned by Dr. Ruter. The third loan of $250,000 was entirely used to repay two outstanding loans to Forreston State Bank. The third loan had a maturity date of April 15, 2015, and was also secured by a blanket security interest in the personal property of the Schrvers, Schryver Gun Sales, Inc., and Dr. Ruter and by mortgages in the Schryvers' Forreston residence, the Oak Ave. Property and the same storage facility and farm land owned by Dr. Ruter.

According to the testimony of the president of Forreston State Bank, Jeff Snyder, Schryver Gun Sales, Inc. was in financial distress in early 2012. The 2012

---

[3] As discussed further below, Dr. Ruter eventually purchased the notes and security interest rights securing those notes from Forreston State Bank as part of a settlement of his obligations under the guarantees.

loans were part of a restructuring of the Schryvers' debt to the bank. Forreston required the additional guarantee and pledge of collateral by Dr. Ruter as a condition to restructure those loans. However, even after the refinancing the business continued to deteriorate. In May 2012, the loan balances to Forreston State Bank together with accounts payable of Schryver Gun Sales, Inc. exceeded the store's inventory value by $415,307.10. By the end of August 2012, the difference reached $446,597.89. After August, Schryver Gun Sales, Inc. ceased providing Forreston State Bank with required monthly financial information. By October 2012, Schryver Gun Sales, Inc. and the Schryvers had stopped making payments on the loans to Forreston State Bank. The Schryvers attempted to find refinancing of the loans from another bank, but were unable to do so.

### *The Status of the Gun Shop upon Abandonment*

The Schryvers closed the store on or about December 14, 2012. Mr. Snyder testified that, after he heard the store was closing he went to the premises on the 14th and saw the Schryvers moving out some items. He testified that when he asked the Schryvers whether they were removing any inventory, they responded that they were only removing personal items and that they were leaving all remaining inventory for the bank. Mr. Schryver admitted at trial that in December 2012 he moved the business's computer, business records and a six foot mechanic's tool chest containing various parts and wrenches to his home, and later to the business premises of a new company the Schryvers later formed, Schryver Firearms, Inc. He also admitted that in December 2012 he had an air compressor owned by the company

at his home which he subsequently moved to the new premises and continued to use.

On December 15, 2012, both Mr. Snyder and Dr. Ruter visited the store. At this time the bank surrendered possession of both the building and any remaining personal property to Dr. Ruter. According to notes written by Mr. Snyder at the time, he and Dr. Ruter "agreed that inventory could remain in the store since it would be [the bank's] intent that ownership would eventually be transferred to him." (Pl. Ex. 83.) Both Dr. Ruter and Mr. Snyder testified that they were surprised at how little inventory remained in the store when they inspected the premises on December 15. However, both spoke in generalities and, other than the specific firearms and "cheek guards" discussed below, their testimony does not support the inference that the Schryers still possessed or had hidden or transferred significant portions of the inventory of the store. Nor does their testimony support the inference that such transfers, had they occurred, were made with the intent to harm Forreston State Bank.

For example, while Mr. Snyder testified that he was "stunned" to see the condition of the store on December 14, 2012. But when asked to elaborate as to what he saw, he responded that there was "a big pile of junk dumped on the floor in garbage bags, which appeared to have been the items that had previously been on the wall hanging on the wall on fixtures." Mr. Snyder then testified that there was likely ammunition in the "pile on the floor [but he] didn't dig through it." He further claimed that he saw some "junk guns of very little value" and a shotgun worth approximately $1,000. Neither Forreston State Bank nor Dr. Ruter conducted an inventory of what

items were left at the store on December 14, 2012. Dr. Ruter took a series of photographs on the 14th which he offered into evidence without objection. He compared those photographs to pictures of the store taken during a special event held in June 2011. However, these pictures have little, if any, probative value. The earlier event occurred nearly a year and a half before the store closed and the Debtors' filed their bankruptcy petition. But while Dr. Ruter testified that when he visited the store in early December 2012 before it closed it appeared "substantially similar" to what was depicted in the June 2011 photographs, he failed to controvert Mr. Snyder's testimony that the store suffered financial hardship during most of 2012. Nor did he controvert the financial report created by Forreston State Bank—an exhibit that Dr. Ruter offered into evidence—which showed that the store's inventory had substantially decreased: from $327,318.67 in June 2011 to $246,105.12 in July 2011, and further decreased to $195,340.49 by the end of August. (Pl. Ex. 80.)[4]   Thus, contrary to Dr. Ruter's testimony, it is evident that the store inventory had diminished significantly from the levels shown in the June 2011 photographs even before December 2012.

The court is unable to determine the amount or value of the remaining inventory seen in the various piles captured in the December 14, 2012 photographs. Both Dr. Ruter and Mr. Snyder focused on the lack of firearms remaining in the store. However, it is notable that according to the August 30, 2012 inventory summary,

---

[4] While an August 30, 2012 inventory summary, also offered into evidence by Dr. Ruter, lists the inventory as having a value on a price basis of $195,340.49, the summary shows that the inventory was only worth $140,261.40 on a cost basis as of August 30, 2012. (Pl. Ex. 78.)

firearms made up only a small portion of the store's total inventory.  The category for "firearms" lists only 64 out of 7,754 items, with a total cost value of $14,696.65 out of $140,261.40.  In other words, at least in August 2011 firearms made up only approximately 10% of the total value of the inventory, and had an average cost per firearm of $229.63.[5]  In contrast, the 3,929 accessories on sale made up over half the total value of the inventory, $81,904.63.  Ammunition made up another $22,775.79 of the inventory by cost.  The 27 "scopes" listed with a total cost value of $7,261.37 actually had a higher average cost value than the firearms.  This fact casts significant doubt on both Mr. Snyder's and Dr. Ruter's evaluation of the value of the inventory remaining at the time of their December 14, 2012 inspection of the store.  Indeed, while Dr. Ruter admitted that his photographs showed a number of scopes, he opined without support that they had only "minor value."  But he also testified that he was unable to identify a number of scopes that appeared in his December photograph of one of the display cases.  He also admitted that a number of the December 2012 photographs showed boxes of ammunition with "some value" on several shelves and various gun accessories remaining on the wall and piled on the floor.  Mr. Snyder also testified that there could have been ammunition in some of the piles of items but that he did not dig through them.

### The Cheek Guards and Patent

Prior to the petition date Mr. Schryver was in the process of developing,

---

[5] The inventory also lists a category for "Barrett"—consisting of a single item with a cost of $10,254.18. Presumably this refers to a Barrett rifle, but this was never clarified at trial.  Even if so, firearms still made up less than 20% of the store's inventory value.  It is not clear if this item is the same Barrett rifle discussed in more detail below.

marketing and selling a tactical "cheek guard" that he had designed for use with certain models of semi-automatic rifles.[6] In February 2012, Lin Schryver individually entered into an agreement with Twin Image Inc. for its assistance with the development of the cheek guard. Twin Image was owned by Michael and Brian Potempa. The agreement contained a provision stating that Twin Image Inc. can apply and file for a patent, trademark or copyright, and that:

> any and all Patent/Trademarks/Copyrights and Intellectual Properties will remain in the possession of Twin Image, Inc. until the project is completed or cancelled and shall remain as such until the entire scope of the project has been completed or cancelled. At that time, and at the time of acceptance by the USPTO if so pursued with Twin Image, Inc., Twin Image, Inc. will transfer patent/s to client for the sum of the invoiced price including attorney fees and or other charges as [may] apply. An additional sum of $1.00 will complete the transfer at the time no outstanding invoices due Twin Image, Inc. from the clients account, as related to the Project.

(Pl. Ex. 6.) Either Mr. Schryver or Schryver Gun Sales paid Twin Image $2,500 on February 22, 2012 as an advance payment.[7]

Between February and April 2012, Twin Image prepared various renderings of the design using computer aided design software with input and comments from Mr. Schryver. Brian Potempa sent the Schryvers a Twin Image invoice by e-mail on March 6, 2012 for $2,500 for computer aided design and engineering work and $5,102.52 for prototyping. (Pl. Ex. 11.) The invoice listed the "bill to" as "Schryver Gun Sales, Attn: Lin Schryver," listing the store address. In the description of the

---

[6] A cheek guard or cheek pad is a cushioning device mounted on a rifle and used to cushion or rest one's face on while shooting.

[7] The March 6, 2012 invoice included two payments of $2,500, but listed both as the same date and check number. According to an e-mail from Brian Potempa to the Schryvers on April 4, 2013, this was an error, and Twin Image "backed off" the duplicate payment in a revised invoice. (Pl. Ex. 34.)

project, the invoice noted that the customer was to have "100% Ownership of [intellectual] property."

At Mr. Schryver's request, Twin Image retained attorney Ray Wood in March or April 2012 to obtain a patent on the design on behalf of Mr. Schryver. Brian and Michael Potempa signed and filed a utility or design patent application for the cheek guard with the U.S. Patent and Trademark Office on or about April 20, 2012. The Plaintiff presented as an exhibit a copy of an invoice dated May 16, 2012 invoice from Twin Image for $2,750 for the design patent and $6,500 for the utility patent, including artwork, attorney fees and filing fees. (Pl. Ex. 15.) Unlike the earlier invoices, this May 16 invoice stated that it was billed to "Lastac Inc., Att: Lin Schryver" and listed his home address. It is unclear from the record, however, when this invoice was prepared or sent. Unlike the other invoices submitted as exhibits, Plaintiff's Exhibit 15 did not include a copy of an e-mail by which it was sent. The invoice was stamped as "Paid 03/29/2012," but Mr. Schryver acknowledged during his testimony at trial that the purported "paid" date was one and a half months before the invoice date. Mr. Schryver did not testify as to when or how he received the invoice, and there is reason to believe that the date when this particular version of the invoice actually was created might not be the date stamped on its face. The Plaintiff presented as evidence copies of at least one invoice which had been revised over a year after the original invoice but which was still dated the original invoice date and had no reference on its face to the revision date. (*See infra* note 7, Pl. Ex. 34.)

The reference to Lastac Inc. in Plaintiff's Exhibit 15 is also inconsistent with the copy of the invoice being created on May 16, 2012. Mr. Schryver testified that an e-mail he sent Brian Potempa on August 21, 2012 was "the first time that [Mr. Schryver] would advise Mr. Potempa to move everything over to Lastac Inc. relating to the cheek guard." (Pl. Ex. 18.) Mr. Schryver testified that Lastac was the name of a company he had at one time intended to create to own the cheek guard patent but never actually formed or incorporated.

Michael and Brian Potempa also owned another company named Ka-Ching Global Sourcing Inc. Mr. Schryver entered into an agreement with Ka-Ching dated September 2, 2012 for assistance with the production and manufacture of the cheek guards. However, it appears that Ka-Ching performed work for the Schryvers or their company even before the date shown on the written agreement. On August 22, 2012, Brian Potempa sent the Schryvers an e-mail attaching an invoice from Ka-Ching dated August 17, 2012 for $4,300.00 for tooling work on the cheek guards billable to "Schryver Gun Sales Att: Lin Schryver." (Pl. Ex. 19.) That invoice listed the Schryvers' home address rather than the store address. Brian Potempa had apparently sent an earlier version of this invoice to the Schryvers by e-mail on August 21, 2012, to which Mr. Schryver e-mailed a response on the same day asking him to "[c]hange everything related to the cheek guard and charging handle to Lastac Inc." (Pl. Ex. 18.) On August 22, Brian Potempa also e-mailed to the Schryvers a copy of a $2,800 invoice from Twin Image dated August 21, 2012 for additional computer aided design work that included the design of the packaging for the cheek guard. (Pl. Ex.

20.)  This invoice also stated it was billable to "Schryver Gun Sales, Att: Lin Schryver," listing the Schryvers' home address.  On September 5, 2012, Brian Potempa sent an e-mail to the Schryvers attaching an invoice from Ka-Ching for $484.14 for tooling and packaging production. (Pl. Ex. 21.)  The invoice stated that it was billable to "Lastac Inc. Att: Lin Schryver" at the Schryvers' residence.  Both the e-mail and the invoice stated that the account was "paid in full."

Ka-Ching apparently sourced a company located in China for the production of the cheek guards.  On September 18, 2012, Brian Potempa sent the Schryvers an $80.95 Ka-Ching invoice for samples of the cheek guard. (Pl. Ex. 22.)  The invoice was made billable to "Lastac Inc. Att.: Lin Schryver," listing the Schryvers' home address.  On October 5, 2012, Brian Potempa e-mailed the Schryvers an estimate for the cost of production of 1,000 cheek guards. (Pl. Ex. 26.)  In it he stated that they needed a 50% deposit before they would begin production.  On October 10, 2012, Mr. Schryver placed an order for production of 4,000 cheek guards. (Pl. Ex. 28.)  On October 11, 2012, Brian Potempa wrote to the Schryvers that, other than $228 still remaining due, he had closed out the pre-order balances owed by the Schryvers or their company to both Twin Image and Ka-Ching by applying a $4,700 payment he received on October 5, 2012 and a $5,000 payment he received on October 10, 2012. (Pl. Ex. 29.)  He  attached an itemized statement of charges and payments dated October 11, 2012, and addressed to "Lastac Inc., Att: Lin Schryver" at the Schryvers' home address.

Still further, on October 11, 2012, Brian Potempa e-mailed the Schryvers with an invoice from Ka-Ching, stating that he had received another payment which was

used to pay any remaining balances on the earlier invoices. (Pl. Ex. 30.) Mr. Potempa went on to state that the additional $3,248.00 in payments received was applied towards the $33,200 cost of the 4,000 cheek guards.[8] The attached invoice was dated October 11, 2012, and stated that it was billable to "Lastac Inc., Att: Lin Schryver," at the Schryvers' home address.

In late October, the Schryvers asked the Potempas for minor modifications to the design of the cheek guards, including a different logo and for the guards to be marked with the words "patent pending."  Mr. Schryver testified that it was important to him that the name, initials or logo of Schryver Gun Sales be physically imprinted on the cheek pads because he "was going to market them through my company."  On November 12, 2012, Ka-Ching delivered 99 cheek guards to the Schryvers.  On December 17, 2012, Brian Potempa e-mailed the Schryvers, attaching an invoice from Ka-Ching for $1,638.54 dated December 14, 2012 for shipping charges for the cheek guards and labels from China. (Pl. Ex. 33.)  Again, the invoice stated that it was billable to Lastac Inc., Att: Lin Schryver at the Schryvers' home address. It did not reflect any balance remaining due other than the shipping charge.  Brian Potempa testified at trial that, other than the 99 cheek guards delivered in November 2012 and samples that had provided to the Schryvers, the remainder of the cheek guards produced remained in storage in Ka-Ching's warehouse.  Mr. Potempa did not know the exact number, but testified that it was more than one thousand.

---

[8] There is an unexplained inconsistency between the e-mail and the invoice attached to the e-mail. The e-mail states that the remaining credit of $3,248.00 was applied, but the invoice only reflects application of $3,020.00 to the cost of the cheek guards.

The record is not clear what pre-petition payments the Schryvers made to Ka-Ching after receiving its October 11, 2012 invoice stating a balance due of $30,180.00 on the cheek guards or Ka-Ching's December 14, 2012 invoice for $1,638.54 for shipping. But in their bankruptcy schedules, as well as in the bankruptcy schedules of Schryver Gun Sales, Inc., the Debtors listed a debt to Ka-Ching of only $12,616.41. If both the invoices and this scheduled debt are accurate, then the Schryvers or their company made $19,202.13 in payments to Ka-Ching sometime between October 11 and December 18, 2012.[9] This amount is consistent with Brian Potempo's e-mail suggesting that the Schryvers had to pay at least 50% of the order amount for the cheek guards before manufacture would begin.

At least some of the money that the Schryvers used to make payments to Twin Image and Ka-Ching was financed by an acquaintance named John Rakus. Mr. Schryver testified at trial that Mr. Rakus lent him $2,500 on February 20, 2012, $5,000 on March 28, 2012, $6,000 on October 2, 2012, and $3,500 on October 9, 2012. This testimony was supported by a "Cheek Piece Ledger / Loan to Lin" prepared by Mr. Rakus. There was no testimony as to any terms of the loans. Mr. Schryver admitted that none of these loans were repaid to Mr. Rakus. Mr. Schryver testified that Mr. Rakus "just told [Mr. Schryver] to eliminate it" after he filed for bankruptcy because "[Mr. Rakus] knew [Mr. Schryver] would not be paying it back."

---

[9] Both the Schryvers and Schryver Gun Sales, Inc. stated in their Statement of Financial Affairs that no property was returned to a seller or repossessed within one year prior to the bankruptcy petition and no creditor made a setoff of any debt within 90 days prior to the bankruptcy petition.

### *Specific Firearms Transferred Pre-Petition or not Disclosed*

The evidence presented at trial shows that as of December 18, 2012, either the Schryvers or their company owned certain firearms that were not disclosed in either the Debtors' or the company's bankruptcy schedules. The most valuable of these firearms was a Barrett rifle. Although Mr. Schryver testified that he did not "know if [he] ever owned a Barrett," the evidence showed to the contrary. In a June 8, 2013 Facebook post, Mr. Schryver posted a picture of a Barrett rifle, stating that he was "[s]elling my BarrettM82A1CQ" and offering it for sale for $6,500. He had also posted pictures taken in the summer of 2012 of himself and others firing what he testified to be the same rifle. In an April 2013 post with a picture of the same rifle, he offers an invitation to "come and shoot the Barrett M82A1" at an upcoming open house for a fee. When confronted with the June 2013 post at trial, Mr. Schryver testified that he did not believe he "ever paid for that gun," but admitted that he had described it as his gun in the Facebook post and that "[it] was known as my gun, right."

The firearms acquisition and disposition record of Schryver Gun Sales, Inc. prepared by Mr. Schryver shows that the Schryvers caused a number of firearms to be transferred from the company to Mr. Schryver shortly before they filed their bankruptcy petition. Most notably, the records state that on December 15, 2012, three days before the bankruptcy and the day after the Schryvers closed the store and abandoned the premises, the company transferred to Mr. Schryver: a Smith and Wesson 22A-1 pistol and a Ruger LC9 pistol. According to the records, three days before, on December 12, 2012, the company transferred to Mr. Schryver: a Stoeger

2000 shotgun, a Remington Arms 700 rifle, a Winchester 02 rifle, a Remington Arms Classic Trap shotgun, a Remington Arms 90-T shotgun, a Savage 220 shotgun, a J Stevens Arms 240 shotgun. The records also show that on September 4, 2012, the company transferred Mr. Schryver a Barrett Rec7 rifle, a Sig Sauer P229 SAS pistol on October 13, 2012, and a Remington Arms 870 Express Mangun shotgun on November 28, 2012.

During his testimony, Mr. Schryver contended that the records did not reflect actual transfers or sales from the company to him. Instead, he claimed that he "signed [the guns] out" of inventory because, in his words: "I had to get my customers' guns out of inventory somehow before the bank took it over so I logged them out myself." He could not explain his theory in detail—whether by "my customers' guns" he meant that the guns were simply on consignment or if he meant that he had or intended to sell them to specific customers but for some reason the sale was not yet complete. In any event, his testimony on this point was controverted by other evidence and lacks credibility. First, he admitted that if the guns were not actually transferred to him he was misrepresenting facts in the disposition record. He admitted that he had filled out ATF Form 4473 Firearms Transaction Records stating that these firearms were transferred to him. Second, in the Statements of Financial Affairs filed with the bankruptcy petitions of both the Debtors and Schryver Gun Sales, Inc., Mr. Schryver stated that neither the Schryvers nor their company were holding or controlling property owned by another person or that they had returned any property to a seller within one year prior to the bankruptcy petition.

The firearms acquisition and disposition record also shows that the company transferred a Glock 19 Gen 4 pistol to Mrs. Schryver on December 4, 2012. Mrs. Schrvyer testified at trial that she purchased the Glock pistol from the company for $504.69 in cash, including tax, in early December. The Plaintiff presented at trial a reprinted sales receipt of Schryver Gun Sales, Inc. for that transaction.

The acquisition and disposition record shows that Schryver Gun Sales, Inc. transferred the following weapons to Forreston State Bank on December 14, 2012: a Crosman C1K77 Quest 1000 rifle, a Sturm Ruger LCP pistol, a Hopkins & Allen 922 rifle, a Beretta 21A pistol, a Glock 23 pistol, a Glock 20 pistol, a Browning Arms Maxus shotgun, a Glock 17L pistol, a Winchester 101 shotgun, and a Kahr Arms CM9 pistol. The record noted in the description of the deposition "Bankruptcy."

### The Bankruptcy Petition and Schedules

The Schryvers filed a voluntary joint Chapter 7 petition through counsel on December 18, 2012. Schryver Gun Sales, Inc. filed its voluntary petition under Chapter 7 through the same counsel on the same date. Lin Schryver signed the company's petition as its president. The Schryvers filed the required bankruptcy schedules and statements with their petition and did not subsequently amend them. Similarly, the required schedules and statements for Schryver Gun Sales, Inc. were filed with its petition and never amended.

In the Schryvers case, they listed in Schedule B among their personal property two shotguns worth $1,000 and a computer worth $400. They marked "None" in response to questions about (i) inventory, (ii) patents, copyrights, and other

intellectual property, (iii) licenses, franchises and other general intangibles and (iv) machinery, fixtures, equipment, and supplies used in business. In response to a question asking for other "personal property of any kind not already listed," the Schryvers listed only a John Deere Lawn Mower. In Schedule B to Schryver Gun Sales, Inc.'s petition, it listed 9 firearms worth a total of $10,000:

```
Kahr Arms 9mm - $300.00
Glock 17L 9mm - $500.00
Ruger LCP .380 - $200.00
Glock 23 .40 - $500.00
Beretta 21A .22 - $200.00
Glock 20 10 mm - $400.00
Winchester 101 12 ga - $1300.00
Hopkins & Allen .22LR - $300.00
Browning Maxus 12 ga - $1,000.00
```

It is unclear from the record whether any of the "junk guns" that Mr. Snyder referred to as being on the premises on December 14, though these nine firearms were listed in the acquisition and disposition record for the store as transferred to Forreston State Bank on December 14, 2012 (in addition to a Crosman C1K77 Quest 1000 rifle). The corporation also scheduled "Misc. office equipment" worth $200.00 and "firearms, ammunition and accessories" of "unknown" value as "inventory." The corporation did not schedule any "patents, copyrights, and other intellectual property" or any "machinery, fixtures, equipment and supplies used in business." The Debtors did not list "Lastac" as either a business in which the debtor was an officer or sole proprietor in response to question 18 of their Statement of Financial Affairs, nor did they list "Lastac" as a trade name used within the past 8 years in their petition.

In Schedule F to both the Schryvers' individual petition and the petition of

Schryver Gun Sales, Inc., the Schryvers listed a $12,616.41 unsecured debt to Ka-Ching Global Sourcing, but did not list any debts to Twin Image, Inc. or to John Rakus. In Schedule G, the Schryvers and Schryver Gun Sales, Inc. each listed their only executory contract as the contract to purchase the Oak Ave. Property from Dr. Ruter. In Schedule I, the Schryvers listed themselves as unemployed and their only expected income to be $1,400 in child support that Mrs. Schryver received. They did not list any increase or decrease in income reasonably anticipated to occur within the year following the petition date. Finally, in their Statement of Financial Affairs, the Schryvers stated $31,546.20 for Mrs. Schryver and $23,720.90 for Mr. Schryver for their income from 2012 to the date of the petition from employment or operation of a business. In both the Schryver's and Schryver Gun Sales, Inc.'s Statement of Financial Affairs they listed "none" in response to a questions about property repossessed by a creditor within one year prior to the petition date and about property transferred within two years before the petition date other than in the ordinary course. They each listed no property held for another person.

It is uncontroverted that the Schryvers continued to sell gun accessories and firearms after the petition date. On December 20, 2012, Mr. Schryver posted on his "Schryver Firearms" Facebook page that they had moved out of their store at 304 South Oak, and would "temporarily be selling out of our home" until they could find a new location. (Pl. Ex. 56.) They placed advertisements offering to sell their cheek pads for $100 each on a gun broker website on November 30, 2012, listing "schryverfirearms" as the seller. This advertisement continued to run through

February 28, 2013.  The Schryvers then formed a new company named Schryver Firearms, Inc., which they incorporated in January 2013,[10] and advertised their cheek pads on its website as well for the same price at least as early as March 13, 2013.  By January 23, 2013, they had sold eight cheek pads through the gun broker website.  They also sold several through Schryver Firearms, Inc., which opened a physical store on First Avenue in Forreston, Illinois.  They continued selling cheek pads through the new store, including one on January 22, 2013, one on February 28, 2013 and one on April 2, 2013.

At trial Mr. Schryver first testified that he believed that he did not own the cheek pads and gave the proceeds of cheek pads that he sold post-petition to the Potempas.  But he then contradicted that testimony by testifying that the "money went into Schryver Gun Sales although Schryver Gun Sales never paid us for the purchase."  It is undisputed that Schryver Gun Sales had filed for Chapter 7 protection by this point, and the Schryvers provided no evidence that they turned over proceeds of sales to the Chapter 7 trustee.[11]  Mr. Schryver's testimony that he believed that the cheek guards were still owned by Ka-Ching and that he was only selling them at Ka-Ching's request was inconsistent with the testimony of Brian Potempa.  Such belief also does not square with the fact that $8.30 was the per unit cost of cheek pads charged by Ka-Ching to the Schryvers nor with the undisputed fact that the Schryvers had paid Ka-Ching well more than 100 times this amount,

---

[10] Lin and Annette Schryver were equal co-owners of the new company.  Lin was its president.

[11] To the contrary, the Final Report of the Chapter 7 trustee for the estate of Schryver Gun Sales, Inc. reflects that the estate did not receive any funds from cash, financial accounts, accounts receivable, firearms and hobby equipment or inventory. (Case No. 12-B-84686, ECF No. 50.)

$830.00. The invoice dated October 11, 2012 shows that at least $3,020 had been paid towards the price of cheek guards, and as noted above, there is evidence that the Schryvers had paid Ka-Ching more than $19,000 towards this charge. Thus, even if the Schryvers were unsure if they had purchased all 3,900 cheek guards sitting in the Potempas' warehouse, there could have been no doubt that they had purchased and owned at least the 100 cheek guards they had in their possession and were actively selling. Additionally, Mr. Schryver admitted that Schryver Firearms, Inc. kept the proceeds that it received for cheek guards sold through the new store and that those funds were reflected in its general ledger.

On or about January 10, 2013, Mr. Schryver submitted the application for a federal firearms license for Schryver Firearms, Inc. The company received its license in March 2013. The Schryvers continued to work with Twin Image after the petition date to obtain a patent for the cheek guard. On March 25, 2013, the U.S. Patent and Trademark Office sent attorney Wood a notice that the application for patent had been allowed and a fee of $510 was due. On April 4, 2013, Brian Potempa sent the Schryvers an e-mail attaching an invoice for the filing fee for the patent, including $530 for the USPTO filing fee and $200 for "labor to submit approved application." The original invoice stated that it was billable to "Lastac Inc., Att: Lin Schryver" at the Schryvers' home address.[12] After Mr. Schryver contacted Brian Potempa and asked him to change the invoice, Twin Image sent a revised invoice now made billable

---

[12] On the same date, Brian Potempa sent an e-mail noting that the original March 6, 2012 invoice had accidentally duplicated a $2,500 payment by check dated February 22, 2012, and attached a revised invoice dated March 6, 2012, backing out the $2,500 error. The invoice stated that it was billable to "Lastac Inc., Att: Lin Schryver."

to "Schryver Firearms Inc., Att: Lyn Schrvyer" at the company's First Avenue address. The Schryvers paid this invoice by a check dated April 4, 2013 drawn on the checking account of Schryver Firearms Inc. The U.S. Patent and Trademark Office issued a design patent for the cheek guard on July 30, 2013, listing Brian and Michael Potempa as the inventors.

In January and February 2013 and before Schryver Firearms, Inc. was issued a firearms license, either the Schryvers or the new company sold the following firearms to third parties: a Colt Commando for $730.00, a Colt Police 38 for $280, a Stoeger Uplander for $275.00 and a McMillan Tac50A1 rifle for $6,050. Mr. Schryver also continued to provide ceramic coating services to third parties, both individually and through Schryver Firearms Inc. using the equipment owned pre-petition by Schrver Gun Sales, Inc.

The meeting of creditors for the Schryvers was held on January 24, 2013. The meeting of creditors for Schryver Gun Sales, Inc. was held on the same date. At trial, the Plaintiff presented several excerpts from an audio recording of Mr. Schrvyer's testimony at the Debtors' Section 341 meeting and as corporate representative at the company's Section 341 meeting. At each, he testified that the schedules filed in the respective cases were true and accurate. Although he did testify about the cheek guards and his current business, it was only at the prodding of the Chapter 7 trustee and his testimony was false or misleading.

At the Debtors' Section 341 meeting, in response to the Chapter 7 trustee's question he testified that they had not "been selling guns and related materials from

[their] home since the closing of the business." When the trustee confronted him with Mr. Schryver's Facebook post to the contrary, he testified that he and his wife "were thinking of opening a new business at our house but instead we found another location so that is where we are going." He confirmed again that they had "not been selling anything out of [their] house." When then asked by the trustee if he had sold anything on an online gun broker website, he testified that he had only "listed guns" for another person in December and "that is all I sold." When the trustee then confronted him with the online advertisements for cheek guards, Mr. Schryver admitted "that is on there too." When asked if it was a patented item, he testified that he did not "own the patent on it. Someone in Freeport does." He further stated the name of the patent owner as Twin Image. When asked where he got the cheek guards, he explained that "they were like a kind of sample first shipment from the company" and that they had only "sold probably 10 of the samples." He stated that the "cheek pads are actually owned by Annette and I personally and it is not part of Schryver Gun Sales." He elaborated that "we took a loan out to fund that whole thing and that is the loan you see at American Midwest Bank" in their schedules secured by a Dodge Magnum. Mr. Schryver did not mention the loan from John Rakus. When asked why, if they had bought the cheek pads with loan proceeds they were not listed in the Debtors' personal property. Mr. Schryver explained that "we actually still owe 100% of what the cheek pads amount are. That is listed to Twin Image." When the trustee noted that the Debtors had not listed any debt to Twin Image in their bankruptcy schedules, he testified that it "might be from Ka-Ching" and noted the

listed debt of about $12,000 to Ka-Ching.

## DISCUSSION

A.    _Objections to Discharge Under Section 727(a)(4) and (a)(7)_

The Plaintiff has met his burden of demonstrating that both Mr. and Mrs. Schryver are not entitled to a discharge for their false oaths in their schedules and Statement of Financial Affairs.    Pursuant to Section 727(a)(4) of the Bankruptcy Code, a Chapter 7 debtor shall not receive a discharge if "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account." 11 U.S.C. § 727(a)(4)(A).    A creditor may object to discharge on the basis of Section 727(a). 11 U.S.C. § 727(c)(1).    But "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." _Stamat v. Neary_, 635 F.3d 974, 979 (7th Cir. 2011) (quoting _In re Kontrick_, 295 F.3d 724, 736 (7th Cir.2002)).    In order to prevail on its objection the plaintiff must demonstrate by a preponderance of the evidence "that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." _Id._ A debtor's petition, schedules, and Statement of Financial Affairs, as well as her testimony at the meeting of creditors, are statements under oath for purposes of Section 727(a)(4)(A). _Leibowitz v. Grabias (In re Grabias)_, 2016 WL 97455 (Bankr. N.D. Ill. 2016) (citing _In re Baker_, 205 B.R. 125, 130 (Bankr. N.D. Ill. 1997)).

A statement is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the

existence and disposition of the debtor's property." *Stamat*, 635 F.3d at 982. Therefore, in "determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Id.* It is no defense that "admittedly omitted or falsely stated information concerned a worthless business relationship or holding." *Id.* Nor does the plaintiff need to show any harm to creditors or the estate was caused by the false statement or omission. *Village of San Jose v. McWilliams*, 284 F.3d 785, 793 (7th Cir. 2002).

Fraudulent intent includes intent to deceive, which "need not connote intending to obtain a pecuniary benefit." *Skavysh v. Katsman (In re Katsman)*, 771 F.3d 1048, 1050 (7th Cir. 2014). Indeed, "a showing of reckless disregard for the truth is sufficient to prove fraudulent intent." *Stamat*, 635 F.3d at 982. The "cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." *Id.* (quoting *The Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009)). In determining whether a debtor has shown reckless indifference to the truth, the court may consider the debtor's level of education and business experience. *Id.* In addition, a debtor who does not understand the legal meaning of a term used in a question on a bankruptcy schedule should seek advice of counsel. *Katsman*, 771 F.3d at 1051.

Here no specific evidence was presented by either the Plaintiff or the Defendant as to the Schryvers' level of education or as to their business experience prior to incorporating Schryver Gun Sales, Inc. in January 2011, approximately two years prior to the petition date. However, from their testimony, the Schryvers

appeared to have at least the business sophistication of an average owner of a small business. They were able to obtain licenses and without assistance generally comply with regulations in the highly regulated industry of retail gun and accessory sales. They maintained corporate ledgers for Schryver Gun Sales, Inc. and appeared to follow corporate formalities. Mr. Schryver invented a firearm accessory and with the help of Twin Image obtained a patent for it.

That the Schryvers misstatements and omissions in their bankruptcy schedules were at the very least a result of reckless disregard for the truth, and more likely out of fraudulent intent to deceive creditors or the bankruptcy trustee, is seen most clearly in the circumstances surrounding the cheek guards and cheek guard patent and agreements with Twin Image and Ka-Ching. The Schryvers argue that they did not own the patent as of the petition date. They point out that their agreement with Twin Image contained a provision that patents:

> will remain in the possession of Twin Image, Inc. until the project is completed or cancelled and shall remain as such until the entire scope of the project has been completed or cancelled. At that time, and at the time of acceptance by the USPTO if so pursued with Twin Image, Inc., Twin Image, Inc. will transfer patent/s to client for the sum of the invoiced price including attorney fees and or other charges as [may] apply. An additional sum of $1.00 will complete the transfer at the time no outstanding invoices due Twin Image, Inc. from the clients account, as related to the Project.

The Schryvers argue that rights in the patent were still owned by Twin Image because: (1) as of the petition date the patent application had not been accepted, (2) the application was made in the name of the Potempas and (3) the Schryvers still owed money to Twin Image. This is what Mr. Schryver testified at the Debtors

Section 341 meeting when asked about the patent by the Chapter 7 trustee.

However, the evidence shows that the Schryvers had paid all outstanding balances to Twin Image prior to the petition date.[13] The Schryvers were aware of this fact, and for that reason had not listed Twin Image as a creditor in their Schedules. Thus, Mr. Schryver's testimony at the Section 341 meeting that they still owed Twin Image money was false. Moreover, even if they did not own the patent outright as of the petition date, they had an option under the agreement with Twin Image to purchase the rights to the patent for the price of the greater of any outstanding invoices upon completion or $1. Yet the Debtors did not schedule this option right either as property in Schedule B to their bankruptcy petition or as an executory contract in Schedule G. Nor did they disclose this right when questioned by the trustee about the patent at the Section 341 meeting. They were clearly aware of the option right in the agreement, since it was the very basis for their argument that they did not own the patent so long as any amounts were owed to Twin Image.

The Debtors were also clearly aware that the option right was valuable. As of the petition date they had already paid Twin Image more than $10,000 in developing and pursuing the patent and were actively advertising and selling the cheek guards. They had specifically instructed Brian Potempa to inscribe the words 'patent pending' as well as their company's logo on the cheek guards. Mrs. Schryver had asked about the patent pending number in an April 4, 2012 e-mail to Brian Potempa. That they

---

[13] Although the Schryvers still owed Ka-Ching money as of the petition date and Ka-Ching, like Twin Image, was owned by the Potempas, nothing in the agreement suggests that the patent option was contingent on payment of outstanding balances to Ka-Ching.

were aware of the value of the patent is perhaps best seen in that they continued to push to complete the patent application process post-petition, paying Twin Image $730 immediately on April 4, 2013, following the approval of the patent application.

Most telling is the Debtors' failure to schedule and continuing failure to fully disclose either the cheek pad patent or their option to purchase such right. As the Schryvers' business deteriorated in late 2012, the Schryvers asked the Potempas to cease referencing them individually or Schryver Gun Sales when billing for work on the cheek guards, and to only reference instead the fictitious company Lastac, Inc. On August 21, 2012, Mr. Schryver e-mailed Brian Potempa, asking him to "[c]hange everything related to the cheek guard and charging handle to Lastac Inc."— apparently requesting not only a change for future bills but to past records as well. Then, when they filed their bankruptcy petition and schedules, they made no reference to the cheek guard, the patent, to Lastac or to Twin Image. They also failed to schedule the debt to John Rakus by which they financed the development of the cheek guard and patent.

Post-petition, they continued this pattern of concealment. The Chapter 7 trustee apparently learned about the cheek guards from the Debtors' postings on their Facebook page and from the webpage of an online gun broker site that the Debtors were using. But when the trustee asked the Debtors about the cheek guards at the Section 341 meeting, Mr. Schryver deflected the line of questions. He told the trustee that "someone in Freeport" owned the patent for the cheek guard. Mr. Schryver also told the trustee at the creditors meeting that they had obtained

financing for the cheek guard project from American Midwest Bank, in return for which they offered a security interest in their car. He did not mention the financing the Debtors had received from John Rakus, which remained outstanding but was not scheduled as a claim in either the Debtor's or the company's bankruptcy schedules. Then, in April 2013, when Brian Potempa sent an invoice for labor and fees relating to the patent application, Mr. Schryver asked Mr. Potempa to cease referencing Lastac and instead revise all invoices to only reference the Schryvers' newly formed entity, Schryver Firearms, Inc.   These circumstances, when combined with the Debtors' failure to schedule the cheek guards or rights to the patent, demonstrate an intentional scheme to conceal their or Schryver Gun Sales' interests in that property.

The same is true for the cheek guards, which were not scheduled as property in the Schryvers' bankruptcy schedules. The evidence shows that Ka-Ching had not exercised any right of reclamation and that, even if a portion of the full purchase price remained outstanding, the Schryvers owned all of the 4,000 cheek guards ordered, including the 99 cheek guards actually delivered pre-petition. And yet, the Schryvers failed to disclose this property in their schedules. Although Schedule B of Schryver Gun Sales, Inc. listed unspecified firearm "accessories" as inventory of "unknown" value, this entry did not include the cheek guards.   Indeed, Mr. Schryver later admitted at the Section 341 meeting that the "cheek pads are actually owned by Annette and I personally and it is not part of Schryver Gun Sales." When asked about the Debtors' online advertisements for the cheek guards at the Section 341 meeting, Mr. Schryver downplayed their value and the Debtors' interest in them.   He

characterized the cheek guards mentioned in the online posts as simply a batch of "samples" that they had received.  Mr. Schrvyer further testified to the trustee that they did not actually own any of the cheek guards because the Debtors "still owe 100% of what the cheek pads amount are."

Moreover, the explanation that the Schryvers offered for why they failed to schedule the cheek guards are not believable.  Indeed, the explanation suggests that the Debtors made other false oaths.  For example, if as the Schryvers suggested they did not own the 99 cheek guards they possessed and were attempting to sell as of the petition date, then it was a false oath to declare as they did in their Statement of Financial Affairs that they did not hold or control any property owned by another.  If they contended that Ka-Ching had repossessed cheek guards after the Debtors failed to pay their outstanding invoices, then it was another false oath to fail to disclose those repossessions or returns in their Statement of Financial Affairs.

The Debtors failed to disclose other assets and made other false oaths in their petitions, further demonstrating their reckless disregard for the truth or fraudulent intent.  In their Schedule B they disclosed as firearms only "two shotguns" worth $1,000, which Mr. Schryver testified referred to a Benelli Super Shot Sport and a Remington 870 Express.  In so doing, they concealed the Barrett M82A1 rifle that the Schryvers then attempted to sell for $6,500 in June 2013.  Mr. Schryver testified at trial that the Barrett rifle he offered for sale in 2013 was the same rifle that he posted pictures of pre-petition holding it out as his own.  Although Mr. Schryver testified at trial that he did not "remember if it was ever mine or not," this testimony is not

believable.  The Schryvers also failed to disclose a Smith and Wesson 22A-1 pistol, a Ruger LC9 pistol, a Stoeger 2000 shotgun, a Remington Arms 700 rifle, a Winchester 02 rifle, a Remington Arms Classic Trap shotgun, a Remington Arms 90-T shotgun, a Savage 220 shotgun, or a J Stevens Arms 240 shotgun that the evidence shows were transferred from Schryver Gun Sales, Inc. to Mr. Schryver less than a week before the petition date.  Nor did they schedule a Barrett Rec7 rifle or Sig Sauer P229 SAS pistol that the evidence shows were transferred to Mr. Schryver within 90 days before the petition date or a Glock 19 Gen 4 pistol Mrs. Schryver purchased from the company for $504.69 on December 4, 2012.

Additionally, the Schryvers did not disclose in Schedule B filed with their petition and with Schryver Gun Sales' petition a tool chest, several computers, an air compressor and other tools and equipment that were in the Schryvers' possession and shown to be either owned by them or by the company as of the petition date.  To the extent still owned by the company, the Schryvers failed to list these items as property held for another in their Statement of Financial Affairs.  Finally, despite surrendering the Oak Ave. Property to Dr. Ruter and the remaining fixtures and inventory in the building to Forreston State Bank less than a week before the petition dates of both the Debtors and their company, they answered "none" in response to the questions in their own and their company's Statement of Financial Affairs about "property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case."

Both Mr. and Mrs. Schryver were closely involved with the operation of the gun store and in the process of developing the cheek guards for patenting, manufacture and sale. Both are officers and shareholders in Schryver Gun Sales, Inc. As such, both are "insiders" of the business. *See* 11 U.S.C. § 101(31). Section 727(a)(7) provides for denial of discharge where a debtor "has committed any act specified in [Section 727(a)(2), (3), (4), (5), or (6)] on or within one year before the date of the filing of the petition, or during the case, in connection with another [bankruptcy case] concerning an insider." 11 U.S.C. § 727(a)(7). Thus, to the extent any undisclosed property discussed above was in fact owned by Schryver Gun Sales, Inc. rather than the Debtors individually, the omission of such property in the schedules of the corporation also constitutes grounds to deny the Debtors a discharge.

B.    *Objection to Discharge Under Section 727(a)(2)*

The Plaintiff also objects to the Debtors' discharge pursuant to Section 727(a)(2) of the Bankruptcy Code. The Plaintiff has met his burden on this count as well. Pursuant to this subsection, a discharge shall be denied if the debtor "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition." 11 U.S.C. § 727(a)(2). To meet his burden under Section 727(a)(2), the Plaintiff must prove by the preponderance of the evidence:

(1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition; (2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code; (3) that the act was that of the debtor or his duly authorized agent; (4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

*Village of San Jose*, 284 F.3d at 791 (quoting *Lee Supply Corp. v. Agnew (In re Agnew)*, 818 F.2d 1284, 1287 (7th Cir. 1987)). The Plaintiff must prove both "an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002).

The Plaintiff alleges that the Debtors both transferred and concealed their own assets and caused to be transferred and concealed the assets of their wholly owned company Schryver Gun Sales, Inc. Fraudulent intent may be shown through circumstantial evidence. *Village of San Jose*, 284 F.3d at 791. In the context of transfers, courts have looked at factors including: "(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry." *Id.* at 791 (quoting *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)). Concealment "includes preventing

discovery, fraudulently transferring or withholding knowledge or information required by law to be made known." *In re Marcus–Rehtmeyer*, 784 F.3d 430, 442 (7th Cir. 2015) (quoting *In re Scott*, 172 F.3d 959, 967 (7th Cir.1999)). Deliberate withholding of information about assets in a debtor's bankruptcy schedules or while testifying at a Section 341 meeting can constitute concealment of those assets. *Layng v. Urbonas (In re Urbonas)*, 539 B.R. 533, 556 (Bankr. N.D. Ill. 2015). Fraudulent intent for purposes of Section 727(a)(2) "may also be established by demonstrating that the debtor acted with 'reckless disregard,' or 'the state of mind present when a debtor does not care about the truth or falsity' of a statement or situation. *In re Frazier*, 551 B.R. 410, 423 (Bankr. N.D. Ill. June 20, 2016) (quoting *Stamat*, 395 B.R. at 71). The court should consider the debtor's "whole pattern of conduct" in making the determination of fraudulent intent. *Id.* (quoting *Richardson v. Clarke (In re Clarke)*, 332 B.R. 865, 870 (Bankr. C.D. Ill. 2005)).

For many of the same reasons as discussed in connection with the Section 727(a)(4) count, the Plaintiff has proven by a preponderance of the evidence that the Debtors concealed assets that they owned within one year before the petition date or after with actual intent to hinder, delay, or defraud creditors and the Chapter 7 trustee. In particular, they concealed their rights in the cheek guards and rights in or to purchase the cheek guard patent. They did this pre-petition by asking the Potempas to cease referencing them individually in the billing records of Twin Image or Ka-Ching, and to instead bill the fictitious entity Lastac, Inc. They did this in their petition by failing to list either the cheek guard or their rights in the pending patent

or under their agreements with Twin Image and Ka-Ching in either their own bankruptcy schedules or in the bankruptcy schedules of their wholly-owned company. They also helped conceal these rights by intentionally omitting as a creditor John Rakus, who had helped finance the development of and application for a patent for the cheek guards. Mr. Schryver continued this concealment even when directly questioned by the trustee at the Section 341 meeting about the cheek guards and patent by giving false or misleading answers to suggest that the cheek guards and patent were owned by others. And for the reasons discussed at length in the preceding section, the evidence shows that Mr. and Mrs. Schryver knowingly carried out their acts of concealment with the subjective intent to hinder, delay or defraud the creditors and the trustee.

C.    *Exception to Discharge Under Section 523(a)(6)*

Dr. Ruter also sought a determination that the debt he purchased from Forreston State Bank is excepted from the Debtors' discharge as a debt for a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). As discussed above, the Debtors are not entitled to receive a Chapter 7 discharge. Therefore, the request to find a specific debt excepted from a discharge that will not be issued will be denied as moot. *See, e.g., Patel v. Benzakry (In re Patel)*, 2013 WL 2151547 (N.D. Ill. 2013); *Blomberg v. Riley (In re Riley)*, 351 B.R. 662, 674-75 (Bankr. E.D. Wisc. 2006); *Garrett v. Vaughan (In re Vaughan)*, 2007 WL 1128886 (10th Cir. 2007).

## CONCLUSION

Judgement shall be entered in favor of the Plaintiff and against the Debtors on counts II, III, IV, V and VI of the Adversary Complaint, and the Debtors will be denied a discharge pursuant to 11 U.S.C. § 727(a)(2), (4) and (7).  Count I, seeking a determination of non-dischargeability of a specific debt pursuant to 11 U.S.C. § 523(a)(6) will be dismissed without prejudice as moot.  A separate order shall be entered giving effect to the determinations reached herein.


DATE: September 28, 2016      ENTER:

_____

Thomas M. Lynch
United States Bankruptcy Judge